# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

Nº 12-cv-1633 (JFB)(AKT)

————————————————

NORTH SHORE-LONG ISLAND JEWISH HEALTH CARE SYSTEM, INC.,

Plaintiff,

VERSUS

MULTIPLAN, INC., TEAMSTERS LOCAL 210 AFFILIATED HEALTH & INSURANCE FUND, AND LOCAL 812 HEALTH FUND,

Defendants.

————————————————

**MEMORANDUM AND ORDER**
July 12, 2013

————————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff North Shore-Long Island Jewish Health Care System, Inc. ("plaintiff" or "North Shore") brought this action seeking an order of this Court to remand the action to the Supreme Court of the State of New York, County of Nassau ("Nassau Supreme"), where the action originally was initiated. Defendant Local 812 Health Fund ("Local 812") removed the case (with the consent of defendants MultiPlan, Inc. ("MultiPlan") and Local 210 Affiliated Health & Insurance Fund ("Local 210"))[1] from Nassau Supreme to this Court. North

Shore subsequently moved to remand the case back to state court on the grounds that: (1) Local 812 did not have the power to remove the action because it is a third-party defendant; (2) Local 812 did not timely remove the action; and (3) this Court lacks subject matter jurisdiction because the claims asserted against it are not preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

On November 8, 2012, Magistrate Judge Kathleen A. Tomlinson issued a Report and Recommendation ("R&R"), recommending that plaintiff's motion be granted in its entirety on the ground that this Court lacks subject matter jurisdiction because the underlying claim concerns an "amount of payment" as opposed to a "right to payment," which does not bring ERISA's

---

[1] The Court refers to defendants Local 812 and Local 210 collectively as, "defendants." Although MultiPlan is a defendant in this action, it did not participate in the underlying motion practice, and therefore, is not included in the collective "defendants" term.

preemptive force into play. Both Local 812 and Local 210 submitted objections to Magistrate Judge Tomlinson's R&R, which included additional evidentiary submissions by Local 812 and 210 that were not before Magistrate Judge Tomlinson when she first considered defendants' motions. The Court, in its discretion, has decided to consider that additional evidence, and plaintiff has been given an opportunity to respond to it.

For the reasons that follow, having considered the parties' submissions, as well as having reviewed the entire R&R *de novo* (with defendants' respective objections and additional evidentiary submission), the Court denies plaintiff's motion to remand.[2]

## I. Procedural History

Plaintiff filed its complaint on May 11, 2011 in the Supreme Court of the State of New York, County of Nassau. On June 24, 2011, MultiPlan answered the complaint. On November 10, 2011, MultiPlan impleaded Local 812 and Local 210 and served the parties with a third-party complaint. On March 1, 2012, Local 210 answered the third-party complaint. That same day, Local 812 moved to dismiss the third-party complaint.

On March 22, 2012, North Shore amended its complaint to assert direct claims against Local 812 and Local 210. On April 3, 2012, Local 812 filed a Notice of Removal to have the action removed to this Court, where it initially proceeded before Judge Arthur D. Spatt and Magistrate Judge Tomlinson. On April 9, 2012, North Shore filed a motion to remand the action to state court. Subsequently, Local 210 answered the amended complaint on April 12, 2012. On April 30, 2012, Local 812 submitted its opposition to North Shore's motion to remand. North Shore filed its reply on May 7, 2012.

On June 18, 2012, Judge Spatt referred the pending motion to remand to Magistrate Judge Tomlinson for a report and recommendation regarding the remand request. As previously set forth, Magistrate Judge Tomlinson issued her recommendation on November 8, 2012, in which she concluded that North Shore's motion to remand should be granted on the grounds that this Court lacks subject matter jurisdiction over the matter.

On November 21, 2012 Local 812 filed an objection to the R&R and requested oral argument on its objections. Local 210 submitted objections, as well, on November 23, 2012. By letter dated November 26, 2012, North Shore challenged defendants' respective submissions on the grounds that they were procedurally improper. The Court declined to consider the procedural propriety of defendants' submissions at that time, instead instructing plaintiff to submit a response to Local 210 and Local 812's objections. Plaintiff did so on December 5, 2012, and defendants submitted their reply on December 12, 2012.

Following Magistrate Judge Tomlinson's issuance of the R&R and the parties' submission of their objections, Judge Spatt, the district court judge previously assigned to the case, recused himself from the matter on February 19, 2013. The undersigned was then assigned to the case. On April 15, 2013, North Shore requested oral argument regarding the

---

[2] The Court agrees with the R&R's conclusions regarding the propriety of Local 812's removal of the case. That is, the Court agrees that Local 812's removal was timely, and that Local 812 was entitled to remove this case to federal court because it constitutes a direct defendant in this case. (*See* R&R at 8-10.) Accordingly, the Court does not address the R&R's analysis as to these points, instead adopting the analysis contained therein on that issue.

previously submitted and pending objections to the R&R. This Court granted the request, and oral argument was held on May 14, 2013. On May 15, 2013, plaintiff submitted a supplemental letter addressing an issue that was raised at oral argument. On May 17, 2013, Local 812 submitted a letter in response.

The Court has fully considered the parties' submissions *de novo*.

## II. STANDARD OF REVIEW

A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. *See DeLuca v. Lord*, 858 F. Supp. 1330, 1345 (S.D.N.Y. 1994); *Walker v. Hood*, 679 F. Supp. 372, 374 (S.D.N.Y. 1988). As to those portions of a report to which no "specific written objection" is made, the Court may accept the findings contained therein, as long as the factual and legal bases supporting the findings are not clearly erroneous. *Santana v. United States*, 476 F. Supp. 2d 300, 302 (S.D.N.Y. 2007); *Greene v. WCI Holdings Corp.*, 956 F. Supp. 509, 513 (S.D.N.Y. 1997). When "a party submits a timely objection to a report and recommendation, the district judge will review the parts of the report and recommendation to which the party objected under a *de novo* standard of review." *Jeffries v. Verizon*, 10-CV-2686 (JFB)(AKT), 2012 WL 4344188, at *1 (E.D.N.Y. Sept. 21, 2012); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive

further evidence; or return the matter to the magistrate judge with instructions.").

## III. THE PARTIES' POSITIONS[3]

Defendants object to the R&R with respect to its recommendation that the Court grant plaintiff's motion to remand the case to state court. Local 812 and Local 210 both object on the ground that the R&R erroneously concluded that plaintiff's motion to remand should be granted, even though plaintiff seeks to recover payments falling under an ERISA-governed plan, the interpretation of which will be necessary in order to determine Local 812's payment obligations, if any. (*See* Def. Local 812's Objections to Nov. 8, 2012 R&R ("Local 812's Objections") at 1-11; Def. Local 210's Objections to Nov. 8, 2012 R&R ("Local 210's Objections") at 1-7.)[4] Incorporated into this argument are defendants' contentions that a remand is not appropriate because plaintiff constitutes the type of party

---

[3] The Court presumes familiarity with the factual background and procedural posture of the case. Where necessary to an understanding of the Court's analysis, however, the Court provides a brief factual summary. For a greater description of the underlying facts, see Report & Recommendation, *North Shore Long Island Jewish Health Sys. Inc. v. MultiPlan, Inc., et al.*, No. 12-CV-1633(ADS)(AKT) (E.D.N.Y. Nov. 8, 2012), ECF. No. 14.

[4] Local 812 is an employee benefit plan that provides hospitalization, as well as medical, pharmaceutical, and other welfare benefits to eligible employees and their dependents. (*See* Def. Local 812's Mem. of Law in Opp'n to Pl.'s Mot. to Remand ("Local 812's Remand Mem."), Barry I. Levy Decl. ("Levy Decl.") ¶ 3.) The plan is funded by employer contributions made pursuant to collective bargaining agreements between employers and the Soft Drink and Brewery Works Union, Local 812, International Brotherhood of Teamsters. (*See id.*) Similarly, Local 210 is a self-funded health insurance plan providing health care coverage for its union members. (Am. Compl. ¶ 3.) The parties predominantly refer to Local 812's Plan in their submissions. Accordingly, the Court likewise focuses its analysis on this plan, referring to it as "the Plan."

3

that can bring an action under ERISA, the underlying claims are colorable ones for ERISA benefits, and Local 812's actions do not implicate any other independent legal duty. Alternatively, Local 812 argues that, should this Court adopt the R&R, it also should hold that plaintiff is judicially estopped from assuming a contrary position in subsequent litigation. That is, "the Court should make clear that North Shore is judicially estopped from (i) seeking recovery for any claim where a prior partial payment has not already been made, (ii) seeking the reversal of any determination of a denial, and (iii) attempting in the future to rely upon any assignment of rights from a beneficiary with respect to the claims at issue in this case." (Local 812's Objections at 11-12.)

Plaintiff raises several counterarguments to defendants' objections. (*See generally* Pl.'s Mem. of Law in Opp'n to Objections Filed by Defendants to R&R ("Pl.'s Opp'n").) Plaintiff asserts that (1) Local 812's objections to the R&R do not comply with the Federal Rules of Civil Procedure because they are not stated with the requisite particularity (*id* at 2-3); (2) both Local 812 and Local 210 improperly submitted evidence that was not before Magistrate Judge Tomlinson in their objections (*id.* at 4-6); (3) Local 812 and Local 210's arguments that North Shore is an assignee of Plan participant patients is a non-issue that the Court need not address because whether or not there was an assignment to receive payments is a different question from whether the claims at issue should be pre-empted; (*id.* at 6-8); (4) plaintiff's state claims arise from an independent legal duty (*id.* at 9-11); (5) the underlying claims concern an "amount of payment," and not a "right to payment," and therefore, do not implicate Local 812's health plan (*id.* at 11-13); and lastly, (6) Local 812 cannot request relief on the grounds of judicial estoppel because, should this Court adopt the R&R, the case will be remanded to state court, which will then be the appropriate venue in which to address such matters (*id.* at 13-14).[5]

The Court has considered the parties' submissions and has conducted a *de novo* review of the R&R in its entirety. For the following reasons, the Court denies the motion to remand.

## IV. DISCUSSION[6]

---

[5] As to this last point, because the Court has concluded that remand is unwarranted, this argument is moot.

[6] As one of its counterarguments to defendants' objections, plaintiff argues that defendants improperly submitted evidence that was not before Magistrate Judge Tomlinson at the time of her R&R. This argument is a non-starter. Rule 72(b)(3) of the Federal Rules of Civil Procedure provides that "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to," and further, that "[t]he district judge may accept, reject, or modify the recommended disposition; *receive further evidence*; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3) (emphasis added); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the [Magistrate Judge's] report or specified proposed findings or recommendations to which objection is made . . . [and] may also receive further evidence."); *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir. 1989) (noting that the district court reviews a Magistrate Judge's R&R *de novo* and that the district judge may consider new evidence when doing so); *Motorola, Inc. v. Abeckaser*, No. 07-cv-3963 (CPS)(SMG), 2009 WL 2568526, at *1 (E.D.N.Y. Aug. 19, 2009) (reviewing Magistrate Judge's R&R *de novo* and considering plaintiff's newly submitted evidence along with its objections).

Plaintiff also argues that Local 812's objections fail to meet the specificity requirements of the Federal Rules of Civil Procedure, and that Local 812 simply seeks to "engag[e] in a wholesale reargument of the entirety of the issues that were raised in the Motion for Remand." (*See* Pl.'s Opp'n at 2; *see also id.* at 3 (citing Fed. R. Civ. P. 72(b)).) The Court rejects this argument.

In essence, the Court's determination of whether the R&R properly recommended that this matter be remanded to state court turns on whether plaintiff's claims, as pled, implicate ERISA, thereby establishing this Court's subject matter jurisdiction. To best answer this question, the Court briefly sketches the law regarding ERISA as relevant to this case.

---

Local 812's objections to the R&R are specific to the particular grounds upon which Magistrate Judge Tomlinson based her conclusion that plaintiff's motion to remand should be granted, namely (and most basically stated), that this Court lacks subject matter jurisdiction because ERISA preemption is not in play. The R&R based its determination upon the conclusion that neither prong of *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004), discussed in greater detail *infra*, was met under the facts of the case. That is, the R&R determined that "this case involves 'amount of payment claims' that are not preempted by ERISA" (*see* R&R at 17; *see also id.* (stating that "because the Court need not interpret the Plan to resolve the disputes here, the claims do not involve the beneficiaries' rights to payment under the Plan")), and also, that defendants' actions implicated an independent legal duty, separate from the Plan – specifically, Local 812's alleged contract with North Shore (*id.* at 21). In its objections, Local 812 argues that it *does* in fact satisfy both prongs of *Davila* – discussed further *infra* – and for this reason, ERISA preemption is established, providing this Court with subject matter jurisdiction over plaintiff's claims. (*See* Local 812's Objections at 2-5 (setting forth the reasons why plaintiff is the type of party that may bring a claim under an ERISA plan); *id.* at 6-9 (explaining why plaintiff's claims are colorable ones for ERISA benefits); *id.* at 9-11 (asserting that no other independent legal duties are implicated by Local 812's actions).) This is not a matter of Local 812 simply duplicating arguments already disposed of in the R&R, nor is it the case that Local 812's arguments are conclusory or general; rather, its arguments directly target each of the R&R's grounds for concluding that ERISA preemption was not established and the reasons as to why this Court should not accept the R&R's ultimate conclusion. Accordingly, the Court rejects plaintiff's argument regarding the specificity of defendants' arguments and the propriety of their submitted evidence.

## A. ERISA Overview

### 1. Legal Standard

ERISA's main objective "is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). To provide such uniformity, the statute contains broad preemption provisions, which safeguard the exclusive federal domain of employee benefit plan regulation. *See id.*; *see also Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981). One such source of preemption under ERISA is Section 502(a)(1)(B), which serves as ERISA's main enforcement tool in ensuring a uniform federal scheme. Section 502(a)(1)(B) of ERISA provides:

> A civil action may be brought – (1) by a participant or beneficiary - . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

The Supreme Court has explained that "the detailed provisions of § 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987). The Supreme Court has noted how "the inclusion of certain remedies and the exclusion of others under [§ 502's] federal scheme . . . 'provide[s] strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Id.* (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146

(1985)). It likewise has acknowledged that "the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Id.*

For this reason, where a plaintiff brings a state law claim that is in reality an ERISA-claim cloaked in state-law language, ERISA's preemption power will take effect. *See Davila*, 542 U.S. at 207 (stating that "[w]hen a federal statute wholly displaces the state-law cause of action through complete pre-emption, the state claim can be removed" to federal court (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)) (alterations and internal quotation marks omitted)); *id.* at 207-08 ("[W]hen the federal statute completely pre-empts the state-law cause of action, . . . even if pleaded in terms of state law, [it] is in reality based on federal law." (citation and internal quotation marks omitted)); *id.* at 209 (describing ERISA as "one of these statutes" that holds complete preemption power). The effect of this preemptive power cannot be understated: it "prevents plaintiffs from 'avoid[ing] removal' to federal court 'by declining to plead necessary federal questions.'" *Arditi v. Lighthouse Int'l*, 676 F.3d 294, 298-99 (2d Cir. 2012) (quoting *Romano v. Kazacos*, 609 F.3d 512, 519 (2d Cir. 2010)) (alteration in original).

The relevant test for assessing whether a claim is completely preempted under ERISA consists of two parts:

> claims are completely preempted by ERISA if they are brought (i) by "an individual [who] at some point in time, could have brought his claim under ERISA § 502(1)(B)," and (ii) under circumstances in which "there is no other independent legal duty that is implicated by a defendant's actions."

*Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 328 (2d Cir. 2011) (alteration in original) (quoting *Davila*, 542 U.S. at 210); *see also Davila*, 542 U.S. at 210 ("[I]f an individual . . . could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)."); *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65-66 (1987) (noting that section 502(a)(1)(B) of ERISA contains "extraordinary pre-emptive power" that "converts an ordinary state common law complaint into one stating a federal claim," making "causes of action within the scope of . . . § 502(a) removable to federal court"). Additionally, "[t]o avoid potential confusion under the first prong of *Davila*, [the Second Circuit] has further clarified that the plaintiff must show that: (a) he is the type of party who can bring a claim pursuant to § 502(a)(1)(B) of ERISA; and (b) the actual claim asserted can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." *Arditi*, 676 F.3d at 299. Where both of *Davila*'s factors are satisfied – including the two sub-parts to *Davila*'s first prong – ERISA will preempt the state law claim. *Id.* (citing cases).

## 2. Application

### a. *Davila* Prong One

In addressing *Davila*'s first prong, the Court considers whether plaintiff constitutes "the *type* of party that can bring a claim" under Section 502(a)(1)(B), and next, "whether the *actual claim*" at issue constitutes a "colorable claim" for benefits under Section 502(a)(1)(B). *Montefiore*, 642 F.3d at 328; *see also Josephson v. United Healthcare Corp.*, No. 11-cv-3665(JS)(ETB), 2012 WL 4511365, at *3 (E.D.N.Y. Sept. 28, 2012) (acknowledging

the Second Circuit's interpretation of *Davila*'s two-pronged test as consisting of two inquiries under the first prong).

i.    Type of Party

As previously set forth, Section 502(a)(1)(B) clearly provides that a civil action may be brought "'*by a participant or beneficiary*' of an ERISA plan to enforce certain rights under that plan pursuant to ERISA." *Montefiore*, 642 F.3d at 329 (quoting 29 U.S.C. § 1132(a)(1)(B)). Stated differently, the Court considers whether plaintiff here has standing to sue under ERISA.

Generally, ERISA is "narrowly construed to permit only the enumerated parties to sue directly for relief," *i.e.*, a participant or beneficiary of an ERISA plan. *Id.* However, there is a narrow exception for "'healthcare providers to whom a beneficiary has assigned his claim in exchange for health care.'" *Id.* (quoting *Simon v. Gen. Elec. Co.*, 263 F.3d 176, 178 (2d Cir. 2001)); *see also Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 n.7 (3d Cir. 2004) ("Almost every circuit to have considered the question has held that a health care provider can assert a claim under § 502(a) where a beneficiary or participant has assigned to the provider that individual's right to benefits under the plan[.]").

Defendants assert that plaintiff has standing because plaintiff meets *Montefiore*'s recognized-yet-narrow exception for parties who are "healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." *Montefiore*, 642 F.3d at 329. Local 812's argument (accepted by Local 210) goes as follows:

Plaintiff has not identified the payment claims that are at issue here. Thus, as noted both in Magistrate Judge Tomlinson's R&R, as well as in Local 812's Objections to the R&R, Local 812 is unable to effectively assess whether the underlying claims here constitute an assignment of benefits from Plan participants/beneficiaries. (*See* R&R at 15 ("The Court acknowledges the difficulty Local 812 faces in proving that a particular claim is disputed in light of the fact that [plaintiff] has not identified the specific claims at issue. The Court also finds it significant that [plaintiff] does not dispute that the claims at issue were, in fact, assigned to it."); Local 812's Objections at 3 (stating that "North Shore has not identified the claims at issue in this matter, rendering it impossible for Local 812 to confirm that each claim allegedly at issue in this case included an assignment of benefits from its participants and/or their beneficiaries, let alone what claims are at issue").)

When initially presenting its unable-to-confirm-assignment argument before Magistrate Judge Tomlinson, Local 812 asserted that "a random sample of claims submissions from [plaintiff] reveals that it was the assignee of at least three Local 812 Plan Beneficiaries that it treated[,] and [plaintiff] does not dispute in its motion papers that it is the assignee of every Local 812 Plan Beneficiary that it treated." (Local 812's Remand Mem. at 11 (citing Levy Decl. ¶ 8 (stating both North Shore's failure to identify the claims at issue in this case, and that "[i]t is Local 812's belief [] that it is standard practice for [plaintiff] to obtain an assignment of benefits from the Plan Beneficiaries it treated," and that "[a]nnexed hereto . . . is a random sampling of three UB04 forms for Plan Beneficiaries treated by North Shore reflecting that North Shore did receive an assignment of benefits . . . .")).) Stated more succinctly, Local 812 bases its position of an

assignment on both plaintiff's failure to dispute such a contention, as well as certain claims submission forms that plaintiff accepted from Plan beneficiaries, which Local 812 reads as reflecting an assignment.

On reviewing these claim submission forms, Magistrate Judge Tomlinson concluded that the claim forms did not affirmatively show that any assignment had, in fact, occurred. (*See* R&R at 14 (stating that "[t]he sample forms submitted, however, do not reflect that any assignment occurred nor do they contain any language regarding assignment").) In particular, Magistrate Judge Tomlinson noted that although the forms contain boxes with the letter "Y," "which could possibly reflect an assignment," Local 812 failed to proffer evidence showing that such actually is the case, nor did it submit other documentation from an individual with personal knowledge who could confirm the information provided on the forms. (*Id.*) It was largely for this reason – Local 812's lack of evidence supporting its reading of the submitted UB-04 forms – that Magistrate Judge Tomlinson concluded that Local 812 had failed to demonstrate an assignment, and correspondingly, plaintiff's status as the type of party who could bring a claim under ERISA. (*See id.* at 14 (["[W]ithout any further explanation from someone with first-hand knowledge or other evidence, the Court cannot conclude that an assignment occurred . . . .").)

On careful review of the submitted documentation (including new evidence not previously before Magistrate Judge Tomlinson) and the applicable case law, this Court respectfully concludes that plaintiff has standing such that it could have brought its claims under ERISA. The Court bases this conclusion upon the following items in the record: (1) the UB-04 forms that defendants submitted (*see* Def. Local 812's

Mem. of Law in Opp'n to Pl.'s Mot. to Remand ("Local 812's Remand Mem.") Ex. B); (2) a document entitled, "UB-04 Overview," published by the Center for Medicare and Medicaid Services ("CMS")[7] (*see* Local 812's Objections Ex. B); (3) the aforementioned Levy Declaration, drafted by counsel for Local 812 in this matter (*see* Local 812's Remand Mem. Levy Decl.); (4) the declaration of Michael DeBartolome, a member of Local 812's third-party Plan administrator, Crossroads Healthcare Management LLC ("Crossroads") (Local 210's Objections Ex. C, Michael DeBartolome Decl. ("DeBartolome Decl.")); (4) the UB-04 claim forms that DeBartolome offers along with his Declaration (*id.*); and (5) relevant case law in which courts have considered similar forms of documentation when assessing whether an assignment of claims has taken place.

Generally, a UB-04 form is a uniform billing statement used by hospitals (or other institutional providers) to bill a party for medical claims. (*See* Local 210's Objections Ex. B, UB-04 Overview (stating that "[t]he UB-04 . . . is the uniform institutional provider hardcopy claim form suitable for use in billing multiple third party payers," and noting that "[t]he UB-04 is the only hardcopy claim form that the [CMS] accepts from institutional providers (e.g., hospitals, Skilled Nursing Facilities, Home Health Agencies, etc.")); *see also Montefiore Med. Ctr. v. Teamsters Local 272*, No. 09-CV-3096(HB), 2009 WL 3787209, at *2 (S.D.N.Y. Nov. 12, 2009) (describing a UB-04 form as "a uniform billing form"; in that case, the form was utilized where a medical

---

[7] This acronym – CMS – is relevant here for an additional reason: the submitted UB-04 billing statements all contain, in the lower left-hand corner of the forms, the language, "CMS 1450," indicating that the forms are prescribed by CMS. (*See* Local 210 Objections at 2; Local 812's Remand Mot. Ex. B.)

center provided health care services to certain participants and beneficiaries of an ERISA-governed Fund and subsequently submitted claims for payment to the Fund, which required that any payment claims be submitted on a UB-04).

Here, defendants submitted three claims submission forms which they assert indicate an assignment of benefits. (*See* Local 812's Remand Mot. Ex. B.) In its Objection Motion, Local 210 directs the Court's attention to the second of these submitted forms (also resubmitted as Exhibit A to Local 210's Objections), and walks the Court through the relevant language of the form.[8] Of particular interest here is Line Item 53, entitled "ASG BEN." (Local 812's Objections Ex. A.) Page 6 of the UB-04 Overview, submitted as Exhibit B to Local 210's Objections, clarifies that this language signifies an "Assignment of Benefits." (Local 210 Objections at 3; *see also id.* Ex. B.) In the box below this assignment language is the letter, "Y," which defendants assert indicates that the Local 812 Plan participant – on whose behalf Local 812 is paying the bill for plaintiff's rendered health care services – has assigned his or her claim to plaintiff (who has now submitted it to Local 812 for payment). (Local 210 Objections at 3; Local 812 Objections at 4.) The Court returns to this point shortly.

To these arguments regarding the UB-04 forms, plaintiff responds that the Court need not resolve the issue of whether an assignment occurred. (*See* Pl.'s Opp'n Mem. at 6-8.) This is so because, as plaintiff contends, the underlying claims here simply involve a dispute concerning the rates for services rendered to Plan

participants/beneficiaries, which will affect the amount of payment that defendants ultimately owe plaintiff. (*Id.* at 7.) Because plaintiff's claims are separate state law claims arising from a contractual obligation with MultiPlan (and by virtue of this arrangement, with Local 812 and Local 210, explained *infra*), plaintiff argues that the issue of whether an assignment actually occurred is irrelevant. (*See id.* at 6 (stating that "[p]laintiff has not pleaded and is not pursuing any claim in this litigation as an assignee of any patient who received treatment," but instead, "seek[s] claims on the basis of an independent legal duty that arose from a contract that both unions entered into with [MultiPlan]").)

The Court disagrees with plaintiff. For reasons set forth in greater detail *infra*, the Court does not believe this case solely concerns a dispute about an amount of payment owed. Furthermore, the Court does not believe the question as to whether an assignment occurred is inapposite. It is directly relevant to determining one of the first prongs of *Davila*, *i.e.*, whether plaintiff is the type of party that can bring an action under ERISA, and correspondingly, whether any of plaintiff's claims are pre-empted under ERISA. Answering this question turns on whether plaintiff, under *Montefiore*'s noted exception, constitutes a health care provider asserting claims on behalf of plan participants/beneficiaries. *See Montefiore*, 642 F.3d at 329. The UB-04 claim forms submitted by defendants go specifically to this point.

In a newly submitted declaration to the Court, DeBartolome, the President and Managing Member of Crossroads, offers insight into the workings of UB-04 claims forms. (*See* Local 210 Objections Ex. C,

---

[8] The Court notes that the identified language on the second submitted claims form is identical to that language contained on the other two submitted claims forms. (*See* Local 812's Remand Mot. Ex. B.)

DeBartolome Decl.)[9] In his Declaration, DeBartolome states that, according to his reading (as a member of the third party administrator for Local 812's Plan) of the UB-04 forms, an assignment of the Plan participants/beneficiaries' charges to North Shore occurred. (*Id.* ¶¶ 6-10.) DeBartolome states that "[t]hese assignments are indicated by the letter 'Y' entered in the box of Line Item 53 on the UB-[0]4." (*Id.* ¶ 8.) DeBartolome further explains that "Line Item 53 shows whether the [Plan] participant has assigned his/her medical claim to a provider. A 'Y' entered in the Line Item 53 box means that the participant has assigned his/her claim to a provider." (*Id.*)

In support of his declaration, DeBartolome submits several exhibits, including excerpts from the same UB-04 Overview referenced earlier in defendants' exhibits (explaining the Assignment-of-Benefits-import of Line 53), as well as four claims submission forms. These claims submission forms are different from those submitted by defendants. (*Compare* Local 812 Remand Mem. Ex. B *with* Local 210 Objections Ex. C.) However, they also bear the "Y" in Line 53's Assignment of Benefits section, as well as the CMS acronym, indicating that they, too, are prescribed by CMS (the same prescriber as that of the UB-04 forms submitted by defendants). DeBartolome states in his declaration that these billing statements are "copies of UB-[0]4s that North Shore represents are at issue" in a different lawsuit between North Shore and Local 812's third party administrator, Crossroads, and therefore, "by implication [in] the instant action," given that Crossroads is Local 812's Plan's third party administrator. (*Id.* ¶ 9.) Thus, in addition to defendants' Objections' more detailed explanations as to the significance of the "Y" on its previously submitted-into-evidence claims forms, defendants also offer the declaration of DeBartolome, who explains in greater detail why a "Y" on Line 53 supports the conclusion that an assignment here (from Local 812's Plan participants/beneficiaries to North Shore) occurred.[10]

---

[9] By brief means of background, Crossroads serves as the third party administrator for the Trustees of Local 812's Plan or Fund. The 812 Plan – from which payment is sought in this dispute – constitutes an "employee welfare benefit plan" as that term is defined under Section 3(1) of ERISA. (Local 210 Objections Ex. C, DeBartolome Decl. ¶ 2.); *see* 29 U.S.C. § 1002(1) (Section 3(1) of ERISA defines an employee welfare benefit plan as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries . . . benefits"). As such, the Plan provides certain health and medical benefits to Plan participant employees and their dependents. (Local 210 Objections Ex. C, DeBartolome Decl. ¶ 2.) Crossroads' role in relation to the 812 Fund addresses the payment of claims, submitted by hospitals, physicians, or other medical providers (like North Shore), for charges related to medical treatment provided to Local 812's Plan participants/beneficiaries. (*Id.*) When submitting payment requests, medical providers use a claim form, prescribed by CMS, to bill the Plan for those medical services rendered to Plan participants/beneficiaries. (*Id.*) This form is known in the industry as a UB-04 form. (*Id.*) Thus, in this case, North Shore is the medical provider, the referenced UB-04 forms are the billing statements, and the statements concern medical services rendered to Local 812 Plan participants/beneficiaries, with Local 812's Plan being the source from which North Shore now seeks the contested payments on behalf of the Plan participants/beneficiaries.

[10] Through the DeBartolome Declaration, defendants have satisfied Magistrate Judge Tomlinson's concern regarding how to verify the significance of the "Y" on the UB-04 forms. (*See* R&R at 14 (stating that Local 812 had not "provided an affidavit or assignment from a representative of Local 812 or someone with personal knowledge pertaining to the forms submitted").)

Defendants and DeBartolome's reading of the UB-04 forms does not stand in a vacuum. As Local 812 indicates in its Objections, other courts have recognized the existence of an assignment based on a similar form of evidence (*i.e.*, a billing statement containing identical language to that highlighted here), along with, of course, evidence showing that a plaintiff seeks to stand in the shoes of the ERISA plan participants on behalf of whom it seeks payment. (*See* Local 812 Objections at 4.)

For instance, in *Spring E.R., LLC v. Aetna Life Insurance Co.*, the District Court for the Southern District of Texas considered the same issue that the Court now addresses, *i.e.*, whether plaintiff could have brought its claims under ERISA by virtue of the fact that it allegedly received an assignment of benefits from ERISA plan participants. No. H-09-2001, 2010 WL 598748, at *3 (S.D. Tex. Feb. 17, 2010) (stating that "whether Plaintiff received an assignment of the benefits under the ERISA plans from plan members is fiercely disputed by the parties"). The court concluded that defendants had met their burden of establishing such an assignment.

In particular, the court noted defendants' submission of UB-92 forms, which, like the UB-04 forms at issue in this case, constitute "paper forms used by institutions such as hospitals to submit claims for payment of healthcare expenses under patients' health benefit plans." *Id.* The UB-92 form at issue in that case contained a section, in Field Number 53 of the form, entitled "Assignment of Benefits Certification Indicator." *Id.* The court noted that the submitted UB-92 forms in that case contained a letter, "Y," which according to one of plaintiff's administrators' testimony, stood for "yes." *Id.* Although plaintiff asserted this "Y" indicated simply an *acceptance* of assignment of benefits, not

that plaintiff actually *received* such an assignment of benefits, the court was skeptical of plaintiff's explanation. *Id.* Among other factors, the court found the "Y" on the form to be a telling element in support of its determination that an assignment had occurred, stating that "considering the perspective of the party who regularly received and processed these forms, defendants would have naturally assumed upon seeing the 'Y' that, subject to their coverage determination under the relevant ERISA plan, they were obligated to pay Plaintiff directly." *Id.* at *4. Thus, based largely on the UB-92 forms' language, the court concluded that defendants had satisfied their burden of showing that plaintiff could have brought its claims under ERISA. *Id.* ("Because Plaintiff has repeatedly held itself out as an assignee of benefits under the relevant ERISA health plans, both circumstantially and in writing, and it presents no evidence other than the testimony of its corporate representative that it never actually received such assignments, the evidence strongly suggests that it would have the standing to bring an ERISA suit.").

The District Court for the Northern District of Texas reached the same conclusion in *Paragon Office Services, LLC v. UnitedHealthGroup, Inc.*, when also addressing the question of whether plaintiffs in that case had standing to sue under ERISA by virtue of an assignment. No. 11-CV-2205-D, 2012 WL 1019953, at *4 (N.D. Tex. Mar. 27, 2012). Evidence submitted by defendants in support of such standing again included UB-04 forms, which similarly contained a "Y" under the entry, "Assign Ben.," which the court found supported the conclusion of an assignment of benefits. *Id.* Similar to plaintiff here, the plaintiffs in that case argued that they were not suing by way of assignments of benefits, and further, that whether any such assignment of benefits took place is irrelevant. *Id.* The court,

relying on *Spring E.R.*, noted that the evidence in *Paragon Office* was similar to that proffered in *Spring E.R.*, and therefore, was sufficient for purposes of establishing that plaintiffs were assignees of ERISA plan participants' claims, thereby conferring standing. *Id.* at *5.

In *Montefiore*, the District Court for the Southern District of New York noted that the "Y" for "Yes" contained on the submitted UB-04 and UB-92 forms in that case "certif[ied] that [plaintiff] has an assignment of benefits from the patient for that claim." *Montefiore*, 2009 WL 3787209, at *2. Other courts also have held similarly regarding the significance of a "Y" on a UB-04 form for purposes of indicating a payment claim assignment. *See, e.g., North Shore-Long Island Jewish Health Sys., Inc. v. Local 272 Welfare Fund*, No. 12-CV-1056(CM), 2013 WL 174212, at *2 (S.D.N.Y. Jan. 15, 2013) (noting that claims from hospitals could be submitted to an ERISA fund for payment on a UB-04 or UB-92 form, stating that these "[c]laim forms contain a space (Box 53) for the provider to certify that it has an assignment of benefits from the patient for that claim," and indicating as relevant the fact that "[e]ach of the claims for which Plaintiffs here seek reimbursement contains a 'Y' for 'yes' in Box 53, indicating that Plaintiffs have an assignment of benefits from the patient for that claim"); *Israel v. N. N.J. Teamsters Ben. Plan*, Nos. 03-2922(JCL), 05-5309, 05-5737, 05-5742, 2006 WL 2830973, at *5 (D.N.J. Sept. 29, 2006) (finding that hospital had met its burden of establishing a valid assignment where hospital submitted a completed UB-92 form to the Plan and "a provider representative checked the relevant box and signed the completed form, thus representing . . . that a valid assignment was obtained"); *cf. Christ Hosp. v. Local 1102 Health & Ben. Fund*, No. 11-5081(JLL), 2011 WL 5042062, at *5 (D.N.J. Oct. 24, 2011) (finding as a relevant factor against plaintiff having standing to sue under Section 502 of ERISA the fact that the submitted UB-92 form did not contain a "Y" for "yes" in the form's Box 53, in which providers certify whether or not they have a valid assignment).

Thus, on careful review of defendants' various submitted claims forms, as well as the relevant case law and DeBartolome's declaration and corresponding submissions, the Court concludes that the UB-04 forms, at the very least, make it more likely than not that an assignment here did, in fact, occur. *See Spring E.R.*, 2010 WL 598748, at *3 (stating that "[a]s the removing party, Defendants bear the burden of demonstrating by a preponderance of the evidence that there was such an assignment"). The Court cautions, however, that it does not base its conclusion as to an assignment solely on whether or not a "Y" is contained in Box 53 of the UB-04s. This is so for the following reasons.

First, as Magistrate Judge Tomlinson correctly noted, and as defendants also acknowledge, North Shore, in its pleadings, fails to identify the benefit claims at issue in this matter. (*See* R&R at 12; Local 812's Objections at 3.) Thus, in the absence of such identification, defendants cannot conclusively determine whether the presently contested claims were subject to an assignment. However, this should not be held against defendants. This is plaintiff's case. And the only reason defendants cannot decisively confirm that the underlying benefit claims here include an assignment of benefits is because plaintiff repeatedly has chosen – in its pleadings, arguments in support of remand, and opposition arguments to defendants' R&R Objections -- not to identify the claims at issue in this dispute. Plaintiff cannot ask the Court to view the evidence in a light most favorable

to it when plaintiff, at the same time, is responsible for casting much of its claims in darkness, possibly to preserve the appearance of state court jurisdiction. It is well-settled that "a plaintiff may not defeat federal subject-matter jurisdiction by 'artfully pleading' his complaint as if it arises under state law where the plaintiff's suit is, in essence, based on federal law." *Schultz v. Tribune ND, Inc.*, 754 F. Supp. 2d 550, 556 (E.D.N.Y. 2010); *see also Arditi*, 676 F.3d at 298-99 (noting that ERISA's preemptive power "prevents plaintiffs from 'avoid[ing]' removal' to federal court by 'declining to plead necessary federal questions'" (quoting *Romano*, 609 F.3d at 519)). For plaintiff to seek payment on the underlying claims here, it must make clear what these claims actually are; it cannot, in turn, fault defendants for lack of such information when plaintiff is the one refusing to relinquish it.

Second, even if it is not absolutely clear that the UB-04 billing statements submitted by defendants here represent some of the claims at issue in this dispute, these are not the only billing statements before the Court. Defendants also submitted the declaration of DeBartolome, a Crossroads representative, who also offered several UB-04 claims forms. These forms strongly suggest that an assignment of the underlying claims in this dispute took place for the following reasons.

As DeBartolome explains in his declaration, North Shore brought an action against Crossroads in 2009, and "[t]he medical billings at issue in North Shore's claims against the 812 Fund in the instant case are the same as the medical billings in the North Shore/Crossroads Litigation." (DeBartolome Decl. ¶ 6.) DeBartolome stated that North Shore's attorney "transmitted to the 812 Fund a list of medical claims North Shore represents are at issue in the North Shore/Crossroads

Litigation[, and] [t]he 812 Fund forwarded this list to Crossroads for review." (*Id.* ¶ 7.) DeBartolome noted that, included with his declaration are copies of UB-04 forms "that North Shore represents are at issue in the North Shore/Crossroads litigation and by implication the instant action." (*Id.* ¶ 9.) These UB-04 forms, like those submitted by defendants, bear the telltale "Y," indicating an assignment of benefits. Further, it is more likely than not that these UB-04 forms pertain to the claims at issue in this dispute, given that North Shore has brought separate suits against both Local 812 *and* its Plan administrator, Crossroads, but as to the same medical billings. Thus, these UB-04 forms further support the conclusion that an assignment more likely than not occurred.

Third, and quite notably, North Shore never denies that an assignment of benefit claims took place. Instead, it asks the Court to simply sidestep this issue altogether, calling it a "red herring." (Pl.'s Opp'n at 6.) However, North Shore's silence on this point is deafening.[11] North Shore, as the provider seeking payment here, is the party responsible for filling out the UB-04 billing statement forms, a necessity to its receiving payment; in so filling out the forms, it, for all intents and purposes, represented that it had received an assignment of benefits by virtue of its inserting a "Y" into Line Item 53. North Shore's lack of an explanation on this issue is telling. *See Spring E.R.*, 2010 WL 598748, at *4 (noting that, where plaintiff "repeatedly held itself out as an assignee of benefits under the relevant ERISA plans, *both circumstantially and in writing*, and it presents no evidence other than the testimony of its corporate representative that it never actually received

---

[11]Indeed, when questioned at oral argument as to why the Court should not consider the fact that defendants' submitted claims forms all bore a "Y" in the field, indicating an assignment, plaintiff had no explanation for this. (*See* Oral Arg., May 14, 2013.)

such assignments, the evidence strongly suggests that it would have the standing to bring an ERISA suit" (emphasis added)). Moreover, even if the Court were to accept plaintiff's unsubstantiated argument that it does not bring these claims here as an assignee, it is well-accepted that this is insufficient for purposes of avoiding pre-emption. *See Paragon Office Servs.*, 2012 WL 1019953, at *4 (denying motion to remand where at least one of plaintiff's state-law claims was pre-empted under ERISA, despite plaintiff's assertion that it was not "standing in the shoes of ERISA plan participants by way of assignments of benefits" (citation and internal quotation marks omitted)); *see also Vetanze v. NFL Player Ins. Plan*, No. 11-CV-2734(RBJ)(KLM), 2011 WL 6813182, at *3 (D. Colo. Dec. 28, 2011) (where plaintiff did not deny that he had received an assignment of patients' claims, but argued instead that he chose not to bring a claim as an assignee, court concluded that "[p]laintiff's argument misses the point, which is whether he had standing to sue as an assignee," and also cautioned that "[i]f choosing not to bring a claim under ERISA, notwithstanding his right to do so, ended the inquiry, then ERISA's complete preemption doctrine would be ineffectual").

Most telling, however, for purposes of concluding that an assignment of benefit claims occurred here is the fact that North Shore, for all intents and purposes, is asserting a colorable claim for benefits on behalf of Plan participants. Stated differently, North Shore stands in the shoes of the Plan's participants and beneficiaries, who received medical services for which payment is now needed. *Montefiore*, 2009 WL 3787209, at *5 (stating that "the mere existence of a purported assignment of benefits is not dispositive of the standing inquiry; rather, the Court must go on to determine whether [plaintiff] seeks to

enforce the patients' rights – *i.e.*, whether by asserting its claims against the Fund, [plaintiff] seeks to stand in the participants' and beneficiaries' shoes to assert their entitlement to benefits directly from the Fund"); *see also North Shore-Long Island Jewish Health Sys.*, 2013 WL 174212, at *5 (stating that "[p]laintiffs meet the [standing] test, because they are health care providers to whom the participants and beneficiaries of the Fund have assigned their claims" and because plaintiffs "stand in the shoes of the Fund's participants and beneficiaries in seeking to receive payment for medical services rendered").

In sum, North Shore has failed to identify the claims at issue; it is notably silent as to defendants' assignment arguments; the various UB-04 billing statements that have been submitted all bear the scarlet letter "Y," indicating an assignment; various courts have concluded that where a defendant has submitted forms, like the UB-04, with such indication, it serves as relevant evidence supporting the conclusion that an assignment has taken place; and, for reasons discussed in greater detail *infra*, it is clear that North Shore here seeks to stand in the shoes of the Plan participants here. Accordingly, this evidence supports the conclusion that North Shore is the type of party that can bring an action under ERISA. Thus, the first facet of *Davila*'s first prong is satisfied.

ii.    Colorable Claim: "Right to Payment" Versus "Amount of Payment"[12]

It is well-established that in order for there to be grounds for the exercise of federal subject matter jurisdiction, there

---

[12]Because the parties only address North Shore's claims against Local 812 as a basis for subject matter jurisdiction, the Court similarly limits its analysis.

need only be a single preempted claim admist a party's pleadings. *See Montefiore*, 642 F.3d at 331 n.11 (in case involving issue of ERISA preemption, court noted that it "need only locate a single preempted claim to establish a basis for the exercise of federal subject matter jurisdiction"); *S.M. v. Oxford Health Plans (N.Y.), Inc.*, No. 12-CV-4679(PGG), 2013 WL 1189467, at *3 (S.D.N.Y. Mar. 22, 2013) (same). The R&R concluded that plaintiff's claims were not colorable ones for ERISA benefits. (*See* R&R at 15-20.) The R&R based this conclusion upon the determination that plaintiff's claims were best categorized as seeking an "amount of payment," and not a "right to payment," the latter of which would have made plaintiff's claims subject to complete ERISA preemption (*See id.*) This was so, as the R&R determined, because plaintiff's dispute simply concerned whether North Shore was required to provide Local 812's beneficiaries with in-network (as opposed to out-of-network) rates, the answer to which, as the R&R found, did not implicate the terms of the Plan. (*See id.* at 17 (stating that "because the Court need not interpret the Plan to resolve the disputes here, the claims do not involve the beneficiaries' rights to payment under the Plan").)

Defendants object to this conclusion, asserting that the language of plaintiff's amended complaint makes clear that at least some of plaintiff's claims do not fall into the "amount of payment" classification. Because resolution of these claims requires an interpretation of the Plan, defendants assert that they fall into the category of a "right to payment" claim, and therefore, constitute colorable claims for ERISA benefits. (*See* Local 812's Objections at 6-9.) The Court turns to the applicable law.

The Second Circuit has noted a distinction between claims concerning a "*right* to payment" versus claims involving an "*amount* of payment." *See Monetfiore*, 642 F.3d at 331 (emphasis added). Whereas the former class of claims "implicate[s] coverage and benefits established by the terms of the ERISA benefit plan," which may be brought under § 502(a)(1)(B), the latter are "typically construed as independent contractual obligations between the provider and . . . the benefit plan." *Id.* On reviewing the amended complaint, the Court agrees with defendants that plaintiff's pleadings include claims implicating ERISA for two principal reasons: (1) plaintiff's claims require an interpretation of the Plan's terms, and (2) at least some of plaintiff's claims concern coverage and benefits issue that implicate ERISA. To best understand this, the Court turns to plaintiff's allegations.

The amended complaint alleges that from 2007 through 2011, North Shore provided health care services to patients who were participants in Local 812's Plan. (*See* Am. Compl. ¶ 76.) It is further alleged that, on September 10, 2007, North Shore, pursuant to the terms and conditions of its contract with MultiPlan, took the requisite steps to exclude Crossroads and its members (including defendants) from eligibility for member Preferred Payment Rates with North Shore. (*Id.* ¶¶ 20-23.)[13] As Local 812

[13] According to the amended complaint, North Shore initially was under a contractual arrangement with MultiPlan (specifically, the "2007 Participation Provider Agreement," or "PPA"), pursuant to which it agreed to provide its health care services to MultiPlan members at discounted rates ("Preferred Payment Rates" or "in-network rates"), and MultiPlan, in turn, agreed to make these special rates available to other health plans and their respective members. (*See* Am. Compl. ¶ 5.) One such health plan with which MultiPlan agreed to provide the aforementioned Preferred Payment Rates was Crossroads (the "MultiPlan Network Agreement"), pursuant to which Crossroads – along with its respective members (here, defendants) – was deemed eligible for access to North Shore's Preferred Payment Rates. (*Id.* ¶¶ 14-15.) So, by virtue of North

15

explains in its initial opposition to plaintiff's motion to remand, the significance of this exclusion is that, after September 10, 2007 (and effective through the period for which North Shore seeks payment), Local 812 was not a party who could send Plan participants to North Shore at discounted rates. (*See*

Local 812 Remand Mem. at 13 (citing Levy Decl. at ¶ 76).) Rather, on account of the exclusion, Plan members were now subject to North Shore's usual, non-discounted rates. (*Id.* (citing Levy Decl. at ¶ 33).)

Plaintiff's allegations do not contradict this point. Specifically, the amended complaint states that defendants "had acknowledged and agreed that plaintiff should be compensated by [] defendants *as a non-participating provider* for health care services provided by plaintiff." (Am. Compl. ¶ 77 (emphasis added).) Additionally, the amended complaint claims that Local 812 owes plaintiff the difference between its Preferred Payment Rates and North Shore's usual non-discounted rates for health care services that plaintiff provided to defendants' Plan participants during the period in question. (*Id.* ¶¶ 33, 78.)

In sum, it is alleged that, as of September 10, 2007, North Shore excluded Crossroads' members (ergo, Local 812 and Local 210) from being able to receive its Preferred Payment Rates for any medical services that it provided to such entities' insureds. Thus, from September 10, 2007 onward, any of defendants' Plan participants who went to North Shore for medical services did so at a non-discounted rate, and not at the previous, contractually agreed upon Preferred Payment Rate.

Given these allegations, to determine what amounts defendants now owe North Shore, the parties cannot solely turn to a contractual agreement (whether between North Shore and MultiPlan or MultiPlan and Crossroads/defendants) to determine the rate of payment that defendants owe North Shore for the untimely or underpaid claims at issue. Instead, because North Shore, via its alleged exclusionary action, must now be treated as a non-participating provider as to those claims falling in the post-September

---

Shore's agreement with MultiPlan, and MultiPlan's agreement with Crossroads, defendants were eligible for North Shore's Preferred Payment Rates.

According to the Amended Complaint, prior to September 10, 2007, it seems that Crossroads breached the terms and conditions of its agreement with MultiPlan by either underpaying the Preferred Payment Rates for health care services rendered by North Shore, or failing to pay such claims in a timely fashion. (*Id.* ¶¶ 17-18.) North Shore warned MultiPlan that, should Crossroads (and correspondingly, defendants) continue to be non-compliant with the terms of MultiPlan's agreement, North Shore would have to exclude those members from its Preferred Payment Rates. (*Id.* ¶ 19.) And, as referenced above, this all came to a head on September 10, 2007, when North Shore excluded Crossroads/Local 812/Local 210 from those rates and benefits previously available to them pursuant to North Shore's contractual agreement with MultiPlan. In short, no more contractually agreed upon Preferred Payment Rates amongst the parties. Following this September 10, 2007 exclusion, members of Crossroads (including defendants) continued to receive services from North Shore, for which North Shore now seeks payment.

By means of additional background, the Court notes that North Shore has sued Crossroads to recover the balance due for such services in a separate lawsuit. (*See id.* ¶ 34.) Although not relevant for purposes of the Court's particular remand-analysis here, the Court also notes that the current litigation initially was brought against MultiPlan for the alleged failure to inform Crossroads and its members of the September 10, 2007 exclusion, in which North Shore alleges fraud and breach of the covenant of good faith and fair dealing. (*See id.* ¶¶ 39-41, 44-46, 54-65, 71-74.) North Shore also brought several claims against Local 812 and Local 210 (including, *inter alia*, breach of contract, unjust enrichment, and quantum meruit); although named as third-party defendants in the amended complaint, defendants are, for purposes of these claims, direct defendants for the reasons set forth in Magistrate Judge Tomlinson's R&R. (*See* R&R at 8-10.)

10, 2007 period, defendants must turn to the terms of the Plan to assess those charges that North Shore can claim from the Local 812 Fund on behalf of Plan participants.

By means of clarification, Local 812 offers the following information: the Plan provides different coverage and benefits depending on whether or not the North Shore physician who rendered the services at issue was a MultiPlan PPO[14] physician – if he/she was, then 100% of those particular charges are covered under the Plan; if he/she was not, then 70% of the charges of those charges are covered after deductible. (*See* Local 812 Objections at 7; *see also* Local 210 Objections at 5-6.) Thus, a review of the Plan's terms will be necessary for purposes of assessing the type of coverage and benefits available (if any) for the medical services provided and for which North Shore, as a non-participating provider, now seeks payment. To this, Local 210 adds the following: as an assignee acting on behalf of Plan participants, North Shore may only claim those payment amounts permitted under the Plan's terms. (*See* Local 210 Objections at 6.) Given its status as a non-participating provider, North Shore may only claim the reasonable and customary cost of its health care services; it may not claim any payment in excess of these amounts. (*See id.* at 5-6 (noting that "Covered Charges" and "Reasonable and Customary Charges" are terms that are defined in the Plan).) Thus, according to Local 210, a review of the Plan's terms, as well as the nature of the medical services provided, is necessary to determine the coverage and benefits available, and ultimately the appropriate payment amount, for those claims that are not governed by the contract with MultiPlan.

The Court concludes that at least some of plaintiff's payment claims here go beyond a simple rate calculation analysis. Instead, they require consideration of the benefits and/or coverage available for the medical services rendered under the Plan, and lastly, the appropriate corresponding payment rate for such treatments for a non-participating provider.

Certainly, plaintiff is correct that mere reference to the Plan for purposes of determining payment terms does not automatically convert an "amount of payment" claim into that of a "right to payment." (*See* Pl.'s Opp'n at 12); *see also Arditi*, 676 F.3d at 302 (stating that "an independent legal duty incorporating Plan benefits on relying on Plan terms and calculations does not in itself lead to ERISA preemption"). However, plaintiff's argument, under the facts presented, misses the mark, and furthermore, contradicts the language of its amended complaint.

Paragraph 33 of the amended complaint makes clear that the claims at issue "consist[], *to a great extent*, of the difference between the Preferred Payment Rates for fees and services and North Shore's usual non-discounted rates as required from out-of-network patients." (Am. Compl. ¶ 33 (emphasis added)). This language, however, creates the express inference that at least *some* of North Shore's claims for payment do *not* fall within this simple difference between the Preferred Payment Rate and usual, undiscounted rate calculus. This makes sense given the factual allegations.

According to the amended complaint, after the September 10, 2007 exclusion, Local 812 no longer was entitled to pay its claims under the rates set forth in the agreement with MultiPlan; rather, it had to pay claims as if North Shore was a non-

---

[14] This term in the industry refers to a preferred provider organization. (*See* Am. Compl. ¶ 2.)

participating provider. (*See id.* ¶¶ 20-23, 77.) Neither the MultiPlan Network Agreement nor the Preferred Provider Agreement, however, requires Local 812 to pay a provider's (here, North Shore's) usual, non-discounted rates in instances where payments are untimely and that provider is treated as non-participating. Notably, North Shore does not argue that either the PPA or MultiPlan Network Agreement requires as such, either. Thus, the issue goes beyond "whether Local 812 was properly afforded those Preferred Payment Rates and, if so, during what time period." (Pl.'s Reply Mem. at 6.) That is, the case does not neatly fall within the confines of a basic mathematical calculation regarding whether a Preferred Payment Rate or a non-discounted payment rate applies, given the lack of any contractual clarification by the parties as to what rate controls in the absence of an agreed-upon in-network rate. Indeed, North Shore cannot even rely on its alleged third-party beneficiary status under the MultiPlan Network Agreement because this contract – between Crossroads (and therefore Local 812) and MultiPlan – nowhere requires Local 812 to pay a provider's non-discount rates in instances of late or incomplete payments. Thus, any benefit owed to North Shore, in its capacity as a non-participating provider, will constitute an obligation that is derived from the Plan and that cannot be resolved by determining the differential between the Preferred Payment Rate and non-discount rate.

In sum, it is these claims, as to which no clear contractual payment rate is set, that necessarily will go beyond any "basic right to payment . . . already . . . established," particularly if they fall during the exclusionary period post-September 10, 2007, and that will require a consideration of the coverage and benefits available under the Plan for those medical services rendered (and for which payment is sought) before

any payment rate analysis may occur. *Montefiore*, 642 F.3d at 331. This a "right of payment" claim.

Moreover, although plaintiff criticizes defendants for being unable to identify those claims that require a coverage or benefit determination before any payment(s) can be made (*see* Pl.'s Opp'n at 11), it should not do so. The only reason defendants cannot clearly identify those claims for which a coverage-benefit analysis is necessary is because *plaintiff* has failed to identify the claims for which it now seeks payment. As previously stated, plaintiff cannot plead its complaint so as to mask what in essence is a federal claim in state law garb. *Schultz*, 754 F. Supp. 2d at 556.

Lastly, paragraph 104(c) of the amended complaint provides further support that at least some of the claims at issue are "right to payment" claim. Although the parties do not discuss this particular paragraph in their motions, it clearly confirms that there are at least some preempted claims in plaintiff's pleadings, thereby permitting the exercise of federal subject matter jurisdiction. Specifically, paragraph 104(c) (included in plaintiff's eighth cause of action, a "third-party beneficiary" claim) alleges that:

> During all relevant time periods herein and prior to September 10, 2007, Local 210 and Local 812 were in breach of the terms and conditions of the agreements they entered into with MultiPlan as follows: . . . (c) *improperly processed, adjudicate[d] and denied and/or issued denials as to properly submitted claims for health care services* rendered by [North Shore].

(Am. Compl. ¶ 104 (emphasis added).)

Thus, plaintiff's own allegations make clear that at least some of its claims concern a denial of benefits. This falls directly into the territory of a "right to payment" claim.[15] *See, e.g.*, *Neuroaxis Neurosurgical Assocs., PC v. Cigna Healthcare of N.Y., Inc.*, No. 11 Civ. 8517 BSJ AJP, 2012 WL 4840807, at *3-4 (S.D.N.Y. Oct. 4, 2012) (noting that only "right to payment" claims "are considered actual claims for benefits and can be preempted"; further clarifying that "'[r]ight to payment' claims involve challenges to benefits determinations, depend on the interpretation of plan language, and often become an issue when benefits have been denied," whereas "'[a]mount of payment' claims involve the calculation and execution of reimbursement payments, depend on the extrinsic sources used for the calculation, and are commonly tied to the rate schedules and arrangements included in provider agreements"); *Josephson v. United Healthcare Corp.*, No. 11-CV-3665(JS)(ETB) 2012 WL 4511365, at *3 (E.D.N.Y. Sept. 28, 2012) (noting distinction between claims for plan benefits that turn on a "right to payment" as opposed to an "amount of payment," and concluding that because some of the reimbursement claims at issue "were denied for reasons that would implicate coverage determinations under the terms of the United benefit plans," federal subject matter jurisdiction applied); *Zummo v. Zummo*, No. 11 CV 6256(DRH)(WDW), 2012 WL 3113813, at

*4 (E.D.N.Y. July 31, 2012) (because plaintiff's breach-of-contract claim required an examination of an employee benefit plan's language and essentially sought enforcement of a right to payment under the terms of that plan, plaintiff's "claim [fell] squarely within the enforcement provision of ERISA"); *Olchovy v. Michelin N. Am., Inc.*, No. CV 11-1733(ADS)(ETB), 2011 WL 4916891, at *4 (E.D.N.Y. Sept. 30, 2011) (Report and Recommendation) (stating that *Montefiore* "teaches that a dispute is a colorable claim for benefits under ERISA when its resolution depends on an interpretation of the terms of an ERISA-governed employee benefit plan; that is, when, in order to determine whether the plaintiff is entitled to relief, the court must look to the terms of employee benefit plan, itself").

For these reasons, plaintiffs' claims are "colorable" under ERISA. Accordingly, they satisfy both facets of the first prong of the *Davila* test.

b. *Davila* Prong Two

The second prong of *Davila* addresses whether any other legal duty, independent of ERISA or the Plans' terms, is implicated. *Davila*, 542 U.S. at 210. The Second Circuit has made clear that the "key words" in conducting this analysis are "other" and "independent." *See Montefiore*, 642 F.3d at 332 (internal quotation marks omitted).

Here, plaintiff contends – and the R&R agrees – that there is no dispute concerning a "right" to payment because North Shore already has received partial payment for the claims at issue; accordingly, the only issue to be determined is "whether Local 812 and Local 210 were properly afforded Preferred Payment Rates and, if so, during what time period." (Pl.'s Opp'n at 9; *see also* R&R at 17.) Thus, so plaintiff argues (and the R&R

---

[15] To the extent plaintiff attempted to assert in its May 15, 2013 supplemental letter that subsection (c) of paragraph 104 – which references denials of claims – does not implicate a "right of payment," the Court disagrees based on the plain language of the allegation. (*See* Pl.'s Letter of May 15, 2013.) Moreover, to the extent that plaintiff is attempting to delete or modify certain allegations in its amended complaint to avoid the preemption issues, it is well settled that jurisdiction is analyzed based upon the pleadings when the notice of removal was filed. *See Law Offices of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 481 F. App'x. 622, 625 (2d Cir. 2012).

accepts), the Court need only determine "whether Local 812 is entitled to any discount under the MultiPlan Network Agreement, either because [defendants] were not eligible or because of their late payments or because they were excluded from the plan." (Pl.'s Opp'n at 9; *see also* R&R at 17 (stating that "[t]his case is distinguishable from *Montefiore* because there is no dispute here over whether the services at issue were covered by the Plan," rather, "[t]he dispute is whether [North Shore] was obligated to provide Local 812's beneficiaries with in-network rates").) In other words, both plaintiff and the R&R take the position that the source of Local 812's payment obligations to North Shore lies in its alleged contractual agreement with North Shore, which serves as the independent legal duty that governs the parties' obligations here. For the following reasons, the Court disagrees.

A review of the contractual history between the parties makes clear that for any claims falling pre-September 10, 2007, there is a governing contractual arrangement pursuant to which defendants' rate of payment may be determined, namely the PPA between North Shore and MultiPlan, and the MultiPlan Network Agreement (between MultiPlan and Crossroads). Following September 10, 2007, however, North Shore excluded Crossroads (and accordingly, defendants) from its Preferred Payment Rates. Thus, any medical services provided during this time – which is the relevant period at issue in this case – were to be assessed as if North Sore was a non-participating provider. (Am. Compl. ¶¶ 20-23, 77.) To calculate *this* non-participating-provider payment rate, reference to the Plan's terms is necessary as there is no governing contractual provision that clarifies whether North Shore's general, non-discounted rate will apply in instances of untimely or underpaid claims. *See supra.*

Indeed, despite the various agreements here, neither party is able to point to language in any of the contracts in which a calculation of rates for North Shore when it is a non-participating provider is specifically set forth. Thus, to adjudicate such claims, reference to the Plan's terms will be necessary in order to determine the parties' obligations for the untimely or underpaid claims, including what coverage and benefits are available under the Plan, as well as the appropriate rate of payment for a non-participating provider. *Cf. Montefiore*, 642 F.3d at 331 (noting distinction between claims implicating coverage determinations under the terms of an ERISA Plan and claims for "underpayment or untimely payment, *where the basic right to payment has already been established* and the remaining dispute only involves obligations derived from a source other than the Plan") (emphasis added).

This case is distinguishable from *Pascack*, 388 F.3d 393, on which both plaintiff and the R&R rely to support the conclusion that no reference to the Plan is necessary to determine the requisite rate of payment for North Shore's submitted claims. (*See* Pl.'s Reply Mem. at 7; R&R at 22.) Plaintiff and the R&R derive this conclusion from the fact that, in *Pascack*, the Third Circuit determined that a hospital's claims for untimely payments were based on a legal duty independent of ERISA because the court only needed to refer to the subscriber agreement to determine the rate of payment. An examination of the case, however, reveals a critical distinction from the facts of this case.

In *Pascack*, the plaintiff-hospital entered into a contract with MagNet, a company (similar to MultiPlan) that agreed to provide discounted rates to members (like defendants) for medical services provided to

beneficiaries of group health plans under the *quid pro quo* that such plans would encourage their beneficiaries to go to network hospitals. 388 F.3d at 396. Significantly, there was a subscriber agreement between MagNet and the members/benefit plans (as network hospitals could not contract directly with the plans) to which it was providing the hospital/plaintiff's agreed-upon discounted rates. *Id.* This subscriber agreement expressly stated that "if Subscriber fails to pay within the appropriate time frame, the Subscriber acknowledges that it will lose the benefit of the MagNet discounted reimbursement rate and that *Network Hospital is then entitled to bill and collect from Subscriber and the Eligible Person its customary rate for services rendered.*" *Id.* (emphasis added). Thus, in *Pascack*, the parties specifically contracted as to the applicable payment rate for when the discount applied, as well as the payment rate for when the discount was deemed inapplicable (in that case, due to untimely payments). *See id.* This is in direct contrast to this case, where there is no contractual agreement (whether between North Shore and MultiPlan or MultiPlan and (via Crossroads) defendants) that sets forth the governing payment rate for untimely payments where the agreed-upon discounted rate is not applicable. For this reason, plaintiff's reliance on *Pascack*'s logic as to why an independent legal duty controls the rate of payment here does not work under the facts of this case.

North Shore's direction of the Court to other theories of law (namely, contract, quasi-contract, unjust enrichment, and quantum meruit), which it claims also serve to establish an independent legal duty here, is similarly unavailing. Regarding the contract and quasi-contract theories of law, it is clear that the parties reached an agreement that Local 812 was to pay North Shore as if it were a non-participating provider during the relevant period at issue in this case (*i.e.*, post September 10, 2007 exclusion). (Am. Compl. ¶ 77.) North Shore does not dispute this, nor does it claim that the parties' agreement (or any other agreement) established any obligation beyond this. Indeed, North Shore cannot argue this, as Local 812's agreement with MultiPlan (via Crossroads) does not require Local 812 to pay a provider's non-discounted rate in instances of untimely or incomplete payments. Thus, as previously set forth, any possible third-party benefit that North Shore could try and claim as a legally independent obligation, whether under a contractual or quasi-contractual theory, fails. In the absence of any contractual or quasi-contractual agreement governing the parties' particular obligations here, any independent duty argument, based on contract or quasi-contract law, fails. *Cf. Montefiore*, 642 F.3d at 331 (distinguishing between claims requiring coverage determination under an employee benefit plan, triggering ERISA preemption, and claims "where the basic right to payment has already been established and the remaining dispute only involves obligations derived from a source other than the Plan").

As to the unjust enrichment and quantum meruit claims, these similarly fail to establish an independent duty under *Davila* or *Montefiore*. In essence, these claims center on the fact that North Shore provided medical services to Local 812's Plan participants and beneficiaries, and now seeks payment for such services. For reasons previously set forth, however, any determination of payment rates in this case will require a review of the Plan to determine the applicable rate for a non-participating provider for untimely or unpaid claims, which, in turn, will require a review of the Plan's provisions on coverage and benefits for such providers, as no governing

contract between the parties established this. Thus, given that any payments here for medical services are derived from rights created under the Plan, these claims remain "inextricably intertwined with the interpretation of Plan coverage and benefits." *Montefiore*, 642 F.3d at 332. Accordingly, they are preempted.

The Court additionally notes its more general concern were it to determine that plaintiff's particular unjust enrichment and quantum meruit claims here were not preempted. Congress has made clear its intent of creating a uniform enforcement scheme that preempts any state-law cause of action that "duplicates, supplements, or supplants" an ERISA remedy. *See Davila*, 542 U.S. at 209; *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 113 (2d Cir. 2008) ("The purpose of ERISA preemption is to ensure that all covered benefit plans will be governed by unified federal law . . . ."); *see also Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 596 (7th Cir. 2008) (noting that ERISA's complete preemption doctrine "confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim"); *cf. Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 386-87 (5th Cir. 2011) (finding plaintiff's quantum meruit and unjust enrichment claims preempted under ERISA on the grounds that "[t]hose claims, if not preempted, would allow any provider who has provided care for which the ERISA plan denied coverage to challenge the ERISA plan's interpretation of its policies in state court," and that such an "outcome would run afoul of Congress's intent that the causes of action created by ERISA be the exclusive means of enforcing an ERISA's plan terms, and permit state law to interfere with the relations among ERISA

entities"). Indeed, the Supreme Court has cautioned courts that "the federal [ERISA] scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected under ERISA." *Pilot Life Ins.*, 481 U.S. at 54.

Because determination of the claims here will, for the reasons previously set forth, require a review of the Plan to determine the parties' respective obligations here – given that no contractual agreement amongst the parties clarifies the requisite payment obligations or extent of coverage or benefits available to a non-participating provider – this case is not one in which an ERISA plan is only tenuously or remotely impacted. *Cf. Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 145 (2d Cir. 1989) (noting that courts "cannot interpret ERISA as preempting state statutes whose effect on [employee benefit] plans is tangential and remote"). Stated differently, because the underlying claims concern rights that, in the absence of a contract addressing defendants' obligations to a non-participating provider for untimely or unpaid claims, are derived from the rights and obligations set forth in the benefit Plan, plaintiff's state law claims are not entirely independent of defendants' federally regulated Plan.

\*   \*   \*

For these reasons, the Court concludes that both prongs of *Davila* are satisfied. Accordingly, at least some of plaintiff's claims are completely preempted under ERISA, which is sufficient for purposes of establishing federal subject matter jurisdiction.

## V. CONCLUSION

Having conducted a *de novo* review of the R&R, and having considered the parties'

additional submissions, the Court denies plaintiff's motion to remand for the reasons set forth herein.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 12 , 2013
       Central Islip, NY

* * *

North Shore is represented by Timothy F. Butler of Tibbetts Keating & Butler, 350 Fifth Avenue, Suite 6215, New York, NY 10118, and Mario D. Cometti, also of Tibbetts, Keating & Butler LLC, 36 West 44th Street, Suite 816, New York, NY 10036. Local 210 is represented by Thomas Alpert Thompson of the Law Offices of Thomas A. Thompson, 148 Whites Cove Road, Suite 1, Yarmouth, ME 04096. Local 812 is represented by Barry I. Levy and Brian Laurence Bank of Rivkin Radler LLP, 926 RXR Plaza, Uniondale, NY 11556.